UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

WACO DIVISION

WACO, TEXAS

FILED

MAY 09 2016

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                  DEPUTY

YOLANDA SALDIVAR

PETITIONER

PETITIONER'S MOTION FOR LEAVE OF COURT TO FILE

"AMICUS CURIAE BRIEF"

IN SUPPORT OF THE PLAINTIFF'S

§1983 FEDERAL CIVIL RIGHTS COMPLAINT MENTIONED BELOW

| | | |
|---|---|---|
| DIANE MICHELLE ZAMORA, TDCJ #814993 | § § § | |
| Plaintiff | § § | |
| v. | § § | Civil Action No.:6:15-CV-365-RP |
| MS. RAY, HUNTSVILLE REPRESENTATIVE | § § § | |
| Defendant | § § | |
| MR. WILLIAM STEPHENS, TDCJ DIRECTOR | § § § | |
| Defendant | § § | |
| MS. MELODYE NELSON, TDCJ WARDEN | § § § | |
| Defendant | § § | |
| MS. WHITNEY FRANKS, TDCJ ASST. WARDEN | § § § | |
| Defendant | § | |

TO THE HONORABLE JUDGE OF THIS COURT:

   Comes now, YOLANDA SALDIVAR TDCJ #733126, Petitioner and a prisoner and

in the custody of the Texas Department of Criminal Justice ("TDCJ") and is not a party to the above litigation and files this Motion for Leave of Court to file this "AMICUS CURIAE" because she has a strong interest in the subject matter and is in support of the Plaintiff, Diane Michelle Zamora TDCJ #814993, a prisoner and in the custody of the Texas Department of Criminal Justice, who has filed a §1983 Federal Civil Rights Complaint in December, 2015 requesting an injunction and/or restraining order against TDCJ prison officials from releasing the Plaintiff to general population.

    The Petitioner is under the custody and authority of the defendants named in the Plaintiff's complaint at the Mountain View Unit where all Protective Custody/Safekeeping offenders are assigned housing. The Petitioner has known the Plaintiff since 1998 in prison at the Gatesville Unit (Now Crane Unit) Reception Satellite in Administrative Segregation. While there, the Plaintiff was brought in from general population into Pre-hearing Detention (PHD) status because of physical assaults from other offenders against the Plaintiff. After multiple physical attacks and bruising found on the Plaintiff's body which medical evaluated, the Plaintiff was "HOUSED" in Administrative Segregation Level III. The Petitioner was referred to the Plaintiff by TDCJ officers who strongly felt the Plaintiff needed legal help to obtain Protective Custody status from offenders who were physically attacking the Plaintiff because of her "HIGH PROFILE" criminal case. TDCJ officers knew that the Petitioner had obtained her Paralegal and Associate Degree in Criminal Justice in prison. TDCJ "RANKING" prison officials (i.e. Capt. Ragsdale) immediately upon learning that the Petitioner would help the Plaintiff legally, tried to discouraged the Petitioner from doing so. Their reasoning to the Petitioner was that the Plaintiff did not deserve Protective Custody but punishment for why they housed the Plaintiff in Administrative Segregation. The Petitioner disagreed with

their findings and proceeded to help the Plaintiff with the preparation of a §1983 Civil Rights action claim. The Plaintiff filed a §1983 Civil Rights Lawsuit requesting the Court's assistance to be placed in Protective Custody. The Court dismissed the Lawsuit due to unavailable funds to pay for the filing fee. The Plaintiff then appealed to Former Assistant Director Janie Cockrell for her intervention in this matter. Director Cockrell then recommended Protective Custody for the Plaintiff. In 2002, the Plaintiff was transferred to the Mountain View Unit under Protective Custody. The Petitioner was then transferred to the Lane Murray Unit under Protective Custody. In March 2009, the Petitioner was then transferred to the Mountian View Unit to be among other Protective Custody offenders including the Plaintiff as the State of Texas made new changes to their policies. In July 2009, Protective Custody offenders were separated from Administrative Segregation offenders into a new building. In August 2015, a new Protective Custody plan was initiated called Protective Safekeeping allowing Protective Custody offenders to work and recreate inside and outside together in a group. This transition incurred problems with its inception. One particular offender, offender Trump who claims to be a member of the organized criminal group, Aryan Brotherhood, began to use her learned tactics as a gang member to impose authority against the Plaintiff and the Petitioner and among other offenders as well. Because the Protective Safekeeping offenders refused to submit to her authority, she sought to make work and group activities difficult in that she would stir up arguments. On October 9, 2015, while the Plaintiff and the Petitioner were working with offender Trump in the garden, offender Trump began verbally attacking the Plaintiff over a plant she disagreed where the Plaintiff was planting it. The verbal attacks were so loud that it caught the Petitioner's attention across the building. As the Petitioner was bent down getting a bucket of water,

offender Trump approached the Petitioner. In offender Trump's anger, she threw a metal object towards the Petitioner landing upright close by at the Petitioner's feet almost hitting her head as the Petitioner was bent down getting some water. This became a great concern for the Petitioner that her security was being jeopardized by this deranged offender. The fact of the matter was that offender Trump was verbally attacking the Plaintiff and attempted to attack the Petitioner with that metal object, but these facts prison ranking officials "REFUSED" to acknowledge, and instead looked the other way.

The Petitioner has been in Protective Custody since 1995 because according to prison officials, the Petitioner's criminal case was and is "HIGH PROFILE" as has the Plaintiff's criminal case. The Petitioner's safety has been a major concern for prison officials for why they have informed the Petitioner that she would never be released to general population. Therefore, this incident with offender Trump attempted assault required the attention of prison ranking officials. Since the implementation of this Protective Safekeeping plan, video cameras were installed inside and outside the building. Feeling comfortable that the cameras would confirm the metal object that offender Trump had thrown at the Petitioner, she filed a complaint against offender Trump. On October 15, 2015, Major Williams held a hearing with the Petitioner where instead of confirming or not the fact of the attempted assault by offender Trump, accused the Petitioner of lying about the metal object as she stated that the cameras do not show such action by offender Trump and that the Petitioner was the aggressor, the bully, the liar and the abuser. The Major went in full attack against the Petitioner. The Petitioner reminds this Court that she was not part of any argument, yet the Major accuses the Petitioner of all wrongdoing. It was later known that offender Trump was considered the Major's "INFORMANT".

(The Petitioner is not privy to any footage of the video camera or finding of facts by prison officials to submit to this Court). What followed next, it seemed evident to the Petitioner and the Plaintiff, that a strategic effort was begun to punish both the Plaintiff and the Petitioner for filing any complaints against offender Trump. Why defend the one exhibiting the aggressiveness? Because offender Trump was the Major's "INFORMANT" as it was told to officer Morales by offender Trump herself. Offender Trump's mother got involved in the matter demanding Warden Nelson to remove and cut off the "HEAD OF THE SNAKE" (referring to the Petitioner) from Protective Custody. Warden Nelson revealed this conversation she had with offender Trump's mother to the Plaintiff's mother (Ms. Gloria Rincon) who then told it to the Petitioner's sister (Ms. Maria Saldivar). Warden Nelson, Assistant Warden Franks and Major Williams, dismissing offender Trump's behavior and aggressiveness, gave the Plaintiff two weeks of disciplinary punishment without ever being served or processed for a disciplinary infraction for any rule/policy violation. The Plaintiff was denied any constitutional due process that is afforded to every prisoner in violating any disciplinary rule. **WOLFF V. McDONNELL**, 418 U.S. at 557, 94 S.Ct. at 2975; **COLEMAN V. DREKE**, 395 F.3d 216. There was no justification for this punishment other than to be verbally blamed by ranking prison officials (i.e. Warden Nelson, Assistant Warden Franks) who by their rapid rush to judgment decided to support offender Trump's aggressiveness and behavior as appropriate and punish the Plaintiff accusing the Plaintiff of being the aggressor, just like Major Williams was accusing the Petitioner. The evidence was not important to them all. With the constant determination of offender Trump's mother to Warden Nelson, Assistant Warden Franks and Major Williams to remove the Petitioner to another unit OR TO "RELEASE THE PLAINTIFF TO GENERAL POPULATION", the latter was decided upon. Moving the Petitioner to

another unit was difficult according to ranking prison officials have told the Petitioner in the past because of her very "HIGH PROFILE" criminal case. Therefore, the alternative was less problematic. The strategy to release the Plaintiff to general population was in full force by Warden Nelson, Assistant Warden Franks and Ms. Ray from Huntsville for on November 18, 2015 (40 days after October 9, 2015) at the State Classification Committee hearing, the Plaintiff was recommended to be release to general population. They disregarded the danger the Plaintiff's life could suffer and has suffered at the hands of aggressive and violent offenders at the Hobby Unit who oppose the Plaintiff because of her "HIGH PROFILE" criminal case as rumor spread throughout the Mountain View Unit of an physical attack the Plaintiff had suffered. The Plaintiff's release to general population was nothing more than to appease the constant demands of offender Trump and her mother because offender Trump was vividly angry with the Petitioner accusing her that filing that complaint against her would and could affect her contact visits with her children. She was content with either the Plaintiff or the Petitioner being removed from Protective Safekeeping. This was accomplished on February 18, 2016 when the Plaintiff was released to general population.

    The two Protective Safekeeping offenders who have had many literary publications and a motion picture produced have been the Plaintiff and the Petitioner where they have had to endure many offensive verbal and physical attacks causing them emotional and physical pain. The Plaintiff has had to seek psychiatric care and is on Zoloft medication for this very reason. The Plaintiff has been the only Protective Safekeeping offender who has experienced physical attacks while in general population. Of the offenders currently in Protective Safekeeping, "FIVE" have never been in general population and have not experienced the physical attacks that the Plaintiff has. Yet, to the prison

ranking officials, they require more protection than the Plaintiff who indeed has suffered these physical attacks and in need of protection. This seems out of character for prison ranking officials to ignore the Plaintiff's history of physical attacks and place her back in the way of danger.

The ranking prison officials have also exercised indiscretion against the Petitioner in violating her constitutional rights. The Petitioner's §1983 Federal Civil Rights complaint is before this Court at this time, assigned docket number W-16-CV-95. Three defendants named in the Plaintiff's complaint are named in the Petitioner's complaint as well. The Petitioner suffered a head injury by the sadistic, obduracy and wantonness behavior of these prison ranking officials when they assigned the Petitioner to an unsafe cell knowing that because of the Petitioner's height, she oculd not climb up and down from a top bunk bed. They refused to listen and refused to move the Petitioner to a lower bunk bed. The Petitioner fell from the top bunk bed hitting her right side of her head sustaining a hematoma. Even after this injury, the prison ranking officials refused to move the Petitioner as a safe cell. The Petitioner was also denied medical care. After 10 days without seeing a physician for the Petitioner's head injury, the doctors at Coryell Memorial Hospital confirmed that the Petitioner had suffered a concussion.

Prison officials are mandated to be unbias in all of their decision-making processes where offenders are concerned. Offender friendliness is prohibited according to policy P.D. 22. Offenders should be able to depend that their well-being and safety are dealt with appropriately without hear that for the comfort of one offender, others are placed in danger.

It is the request of the Petitioner to this Court to review the details in this "AMICUS CURIAE BRIEF" in addition to the Plaintiff's §1983 complaint to weigh into the decision and ruling of this Court.

## DECLARATION

I, <u>YOLANDA SALDIVAR</u>, declare under penalty of perjury that the foregoing is true and correct.


Executed at Gatesville, TExas

Dated: *May 5, 2016*

*Yolanda Saldi—*
DECLARER

May 5, 2016
United States District Court
Western District of Texas
Waco Division
800 Franklin Ave.
Room 380
Waco, Texas  76701



Re:  Civil Action No.: 6:15-CV-365-RP

Dear Clerk:

Enclosed please find "DECLARANT'S AMICUS CURIAE BRIEF" to be filed on behalf of the Plaintiff on the above case number mentioned above.
Please present it to the Court.
Thank you for your assistance in this matter.

Respectfully Submitted,

Yolanda Saldivar   TDCJ #733126
Mountain View Unit
2305 Ransom Rd.
Gatesville, Texas 76528

YOLANDA SALDIVAR 733126
Mountain View Unit
2305 Ransom Rd.
Gatesville, TX 76528

AUSTIN TX 787
RIO GRANDE DISTRICT
06 MAY 2016 PM 4 L

United States District Court
Western District of Texas
Waco Division
800 Franklin Ave
Room 380
Waco, Texas 76701

76701193460