IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| DIANE MICHELLE ZAMORA #814993 | § | |
| | § | |
| V. | § | W-15-CA-365-RP |
| | § | |
| WILLIAM STEPHENS, et al. | § | |

## ORDER

Before the Court are Plaintiff's Second Amended Complaint (#40), Defendants' Motion for Summary Judgment (#41), and Plaintiff's Response (#45). Plaintiff, proceeding pro se, has paid the filing fee in this case.

## I. BACKGROUND

At the time she filed her complaint, Plaintiff was an inmate incarcerated in the Hobby Unit of the Texas Department of Criminal Justice - Correctional Institution Division. Plaintiff files this action pursuant to 42 U.S.C. § 1983 alleging Defendants failed to protect her by transferring her from protective custody (later referred to by TDCJ as "safekeeping") in the Mountain View Unit into general population custody in the Hobby Unit. She alleges that since the transfer she has been subject to threats and attacks that Defendants should have foreseen due to the high profile nature of her conviction and that Defendants have been deliberately indifferent to her safety following the threats and attacks. Plaintiff sues TDCJ Executive Director Brad Livingston; William Stephens, former Director for the Correctional Institutions Division of TDCJ[1]; Melodye Nelson, Warden of the Mountain View Unit; Whitney Franks, Assistant Warden of the Mountain View Unit; and Debbie

---

[1]To the extent Plaintiff brings claims against the TDCJ Executive Director in an official capacity, those claims are against Lorie Davis, the current TDCJ Executive Director.

1

Ray, a representative from the State Classification Committee for TDCJ. Plaintiff seeks to be returned to protective custody and damages for pain and suffering.

Plaintiff arrived in TDCJ custody on February 23, 1998. Pl. Am. Compl. (#40-1) at 10. Plaintiff asserts that her case was high-profile, and there have been several books and a movie about it. *Id.* at 11-12. Because of this, Plaintiff alleges she was threatened and assaulted by general population inmates. *Id.* Consequently, in June of 2002, former TDCJ Director, Janie Cockrell, recommended that Plaintiff be placed in safekeeping at the Mountain View Unit until media attention had lessened. *Id.* at 13. Plaintiff asserts that media attention remains high to this day and that she continues to receive media requests for interviews. *Id.*

Currently, the Mountain View Unit is the only place for safekeeping for female inmates in Texas. Defs. Mot., Ex. A (#41-1) at 28:11-13. There are eight total single-occupancy cells in safekeeping at the Mountain View Unit. *Id.* at 19. Safekeeping is an air-conditioned unit that provides larger cells than general population and each cell contains a television. *Id.* at 28:25-29:7. Plaintiff remained in safekeeping from 2002 until February 18, 2016, when she was transferred to general population in the Hobby Unit.

Plaintiff contends that trouble began while she was in safekeeping in July 2015. Pl. Am. Compl. (#40-1) at 14. At that time, Defendant Nelson allegedly instituted a program to allow the safekeeping inmates to be in greater contact with one another. *Id.* Plaintiff contends that after this program began, another inmate, Kimela Trump, and others began to gang up on Plaintiff and another inmate, Yolanda Saldivar. *Id.* Plaintiff implies that this is because she is known as "The Texas Cadet Murder" and Saldivar is known as "The Selena Murder." *Id.* Plaintiff filed a life endangerment form, and in November 2015 Plaintiff alleges that Defendant Nelson separated the safekeeping inmates

into two separate groups for safety purposes. *Id.* Plaintiff and Saldivar were in one group, and Trump and the other three inmates were in another group. *Id.* Plaintiff alleges that on November 6, 2015, Trump again threatened Plaintiff and Salidvar. Pl. Resp. (#45) at 3. Plaintiff alleges that nine days after the safekeeping groups were separated, Defendant Nelson pushed to remove Plaintiff from safekeeping. Pl. Am. Compl. (#40-1) at 14.

On November 18, 2015, Plaintiff attended a State Classification hearing with Defendants Ray and Franks. *Id.* at 15. Plaintiff asserts that she expressed her desire to remain in safekeeping and that she feared for her safety in general population based on her prior history of being bullied due to her high profile case. *Id.* Plaintiff contends that, when she expressed her desire to remain in safekeeping, Defendant Franks "rolled her eyes and smirked while giving Defendant Ray a nudge." *Id.* Defendant Ray allegedly told Plaintiff that the threats from Trump "didn't count." Pl. Resp. (#45) at 3. When Defendant Ray asked Plaintiff if she got along with other inmates, Plaintiff responded that she only got along with inmate Saldivar. Pl. Am. Compl. (#40-1) at 15. Defendant Ray then told Plaintiff she would be sent to general population. *Id.* Plaintiff mentioned to Defendant Ray that there was a recommendation in Plaintiff's file that she remain in safekeeping. *Id.* Defendant Ray explained that Defendant Cockrell had retired and asked Plaintiff to provide names of any people in general population who were threatening her. *Id.* Plaintiff then admitted that she could not name any person in general population that had made threats against her, but could only name those who had assaulted her in the past. *Id.* Plaintiff also informed Defendant Ray of her concerns with inmate Trump, an offender in safekeeping, and Trump's contacts outside of safekeeping with Trump's former gang. *Id.* at 15-16.

Plaintiff asserts that Defendants Ray, Franks, and Nelson showed callous disregard and deliberate indifference for Plaintiff's safety and failed to protect Plaintiff. Pl. Resp. (#45) at 3-4. Plaintiff contends that Defendants Franks and Nelson desired to punish Plaintiff for her contribution to the failure of the program integrating the safekeeping inmates with one another. *Id.* at 4. Plaintiff contends that Defendants Franks and Nelson influenced Defendant Ray to transfer Plaintiff out of safekeeping as retribution. *Id.* Plaintiff alleges that Defendants Ray, Franks, and Nelson disregarded Plaintiff's safety by placing her in general population at the Hobby Unit, which Plaintiff alleges is "TDCJ's most violent and ill-reputed female unit, [and therefore] an extremely unreasonable choice for a P.C. (protective custody) inmate with a history of vulnerability to threats and attacks." Pl. Am. Compl. (#40-1) at 16.

Plaintiff was moved to general population on February 18, 2016. *Id.* at 17. Plaintiff alleges that on February 19, 2016, an Hispanic assailant attacked her and threatened future attacks. *Id.* Plaintiff alleges that around 11:00 am, while walking with a line of people going back in the direction of her dorm, a light-complected, Hispanic girl attacked her from behind. *Id.* Plaintiff did not know the other inmate, but alleges that the other inmate began kicking at Plaintiff's legs as she walked saying, "I know who you are! You're that snitching cadet bit**!" *Id.* Plaintiff alleges that she felt something sting her neck several times that she believes was a blade. *Id.* Plaintiff alleges she was afraid to look back at the assailant for fear of being cut in the face. *Id.* The assailant continued kicking Plaintiff and allegedly caused Plaintiff to fall. *Id.* Plaintiff alleges the assailant continued to kick her in the thighs while she was on the ground. *Id.* Plaintiff alleges she got up quickly and took off toward her building. *Id.* at 17-18. Plaintiff then alleges she heard her assailant say, "Damn! That's the wrong side!" followed by, "It's alright! I'll see your bit** a** again soon!" *Id.* at 18.

4

The following day, photos were taken of Plaintiff's injuries and an Offender Protection Investigation (OPI) officially began on February 21, 2016, by Sgt. Busch and Lt. Tolvar. *Id.* According to Plaintiff, Lt. Tolvar called Plaintiff's statement "far-fetched" and accused Plaintiff of assaulting herself. *Id.* None of the witnesses interviewed, nine inmates and five staff members, saw any assault whatsoever. *See* Defs. Ex. B at 7-22. On February 22, 2016, Major Jameson denied Plaintiff's plea for protection. Pl. Am. Compl. (#40-1) at 18.

Plaintiff claims that she was attacked again on May 16, 2016, at 4:00 am, while returning to her dorm after breakfast. *Id.* at 19. Plaintiff alleges that she was assaulted by an Hispanic offender by repeatedly being struck in the back with an unknown weapon. *Id.* Plaintiff suffered welts on her back and was threatened with future sexual assault. *Id.* On June 6, 2016, the Court held a hearing for a Temporary Restraining Order based on this alleged assault. The Court found, based on the evidence presented, there was not reason to believe Plaintiff's story. Defs. Mot., Ex. A (#41-1) at 59-60.

Plaintiff alleges that on June 20, 2016, inmate Lizette Vasquez threatened to cut Plaintiff's face. Pl. Am. Compl. (#40-1) at 21. Plaintiff alleges she reported this threat to Captain Sullivan. *Id.* Plaintiff alleges that no investigation had taken place until complaints by Plaintiff's mother forced an investigation on July 8, 2016. *Id.* Captain Sullivan claims that he never received Plaintiff's letter informing him of the alleged threats. *Id.* Plaintiff further alleges that on August 22, 2016, she reported that her cellmate, Leslie Sykes, hit and pushed her, and flushed her underwear down the toilet. *Id.* at 23. Plaintiff contends that initially nothing was done about the incident. Pl. Resp. (#45) at 6. However, Plaintiff asserts she then filed a grievance, and Sykes was moved to another cell. *Id.*

Plaintiff contends that her criminal case was and continues to be high profile. *Id.* Plaintiff claims that media attention and interest remain high and that she continues to receive media requests

5

for interviews. *Id.* Plaintiff indicates several producers have requested her interview and attaches multiple exhibits of media correspondence and photocopies of books and magazine covers, some of which she alleges are available in the prison library system. Pl. Am. Compl. (#40-1) at 22. Plaintiff also alleges that one of the books contains photos of her and has been vandalized with graffiti indicating Plaintiff's housing location at the Hobby Unit. *Id.*

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment arguing Defendants Stephens and Livingston were not personally involved in any actions affecting Plaintiff. Furthermore, Defendants assert they are entitled to qualified immunity. Defendants also argue that to the extent they are sued in their official capacities, they are entitled to Eleventh Amendment immunity. Finally, Defendants argue that Plaintiff is not entitled to injunctive relief.

Defendants argue Plaintiff's claims against Brad Livingston should be dismissed for lack of personal involvement and failure to state a claim. They assert that Plaintiff makes only generalized assertions against Defendant Livingston that he is "legally responsible for the overall operation for the Department and each institution under its jurisdiction." Pl. Am. Compl. (#40-1) at 9. She further makes only conclusory allegations that Defendant Livingston must be responsible for final approval of Plaintiff's release from safekeeping because Plaintiff believes he was the only person who could overrule the recommendation in Plaintiff's file from former Deputy Executive Director Janie Cockrell. *Id.* Defendants argue that Plaintiff fails to name any policy, rule, or regulation supporting these allegations and can offer no evidence of Defendant Livingston's participation in this incident whatsoever.

Defendants argue Plaintiff's claims against Defendant Stephens must also be dismissed for similar reasons. They assert that Plaintiff makes only generalized assertions against Defendant Stephens that he is "legally responsible for the overall operation for the Department and each institution under its jurisdiction." Pl. Am. Compl. (#40-1) at 2. They further assert that Plaintiff made only conclusory allegations against Defendant Stephens that he failed to protect Plaintiff by approving her release from safekeeping. *Id.* Defendants argue that Plaintiff wholly fails to plead any specific facts against Defendant Stephens which create any link between his actions and Plaintiff's alleged injuries.

To the extent that Plaintiff is suing Defendants Livingston and Stephens based on their supervisory roles, Defendants argue that Plaintiff's claim must be dismissed because supervisory officials may not be held liable for their subordinates' actions under any theory of vicarious liability under §1983.

Defendants also argue they are entitled to qualified immunity because Plaintiff cannot establish a constitutional violation for deliberate indifference. Defendants argue that recommending Plaintiff be removed from safekeeping is not in itself a constitutional violation. Defendants claim that Plaintiff has wholly failed to demonstrate that Defendants were aware of facts from which an inference of an excessive risk to the Plaintiff's health or safety could be drawn and that they actually drew an inference that such potential for harm existed. Defendants assert that while they may have been aware of threats to Plaintiff from inmate Trump in safekeeping, they were unaware of any recent threats to Plaintiff's safety from general population. Thus, Defendants argue the threats Plaintiff had received while in safekeeping tended to favor a decision to transfer her out of safekeeping. Further, Defendants assert that there was no indication that the notoriety of Plaintiff's

7

case was high, since she had been away from general population for fourteen years, and Plaintiff's notoriety was arguably no longer at issue considering that her crime and media coverage largely occurred in the 1990s.

Finally, Defendants argue that even if the Defendants' conduct violated the Plaintiff's constitutional rights, they are entitled to qualified immunity because their conduct was objectively reasonable. Defendants argue that the only threats known to them were from an inmate inside of safekeeping and two inmates who had assaulted Plaintiff in general population in the late 1990s. Therefore, Defendants claim it was objectively reasonable for them to believe that moving Plaintiff into general population would not put her at an excessive risk of harm.

### III. PLAINTIFF'S RESPONSE

In her response, Plaintiff reasserts her claims previously presented to the Court. She contends that Defendants were deliberately indifferent to her safety when transferring her back to general population out of safekeeping. As evidence of the excessive risk to her safety, Plaintiff points to her allegation that she has been assaulted three times and threatened one separate time since returning to general population.

Plaintiff alleges that Defendant Livingston had personal knowledge of the facts of her case based on a letter Plaintiff mailed to him. Furthermore, Plaintiff alleges that her mother, family, and pastor also attempted to contact Defendants Livingston and Stephens to urge them not to release Plaintiff to general population, but none of them ever spoke with either defendant.

Plaintiff asserts that Defendants are not entitled to qualified immunity because Plaintiff's need for protection was obvious and well-documented by prison officials in the past due to the high-profile nature of her case. She asserts that her case was, and remains, high-profile. She asserts she

was released from safekeeping as retaliation for filing an OPI against inmate Trump while in safekeeping.

Plaintiff does not dispute that Defendants are entitled to Eleventh Amendment immunity for damages against them in their official capacities. Plaintiff does assert that she is entitled to an injunction to be returned to safekeeping because of her history of vulnerability to attack and because her case remains high-profile.

## IV. ANALYSIS

### A. Summary Judgment Standard

A court will, on a motion for summary judgment, render judgment if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059 (1992). When a motion for summary judgment is made and supported, an adverse party may not rest upon mere allegations or denials but must set forth specific facts showing there is a genuine issue for trial. *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 433 (5th Cir. 1995); FED. R. CIV. P. 56.

Both movants and non-movants bear burdens of proof in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The movant with the burden of proof at trial must establish every essential element of its claim or affirmative defense. *Id.* at 322. In so doing, the moving party without the burden of proof need only point to the absence of evidence on an essential element of the non-movant's claims or affirmative defenses. *Id.* at 323-24. At that point, the burden shifts to the non-moving party to "produce evidence in support of its claims or affirmative defenses . . . designating specific facts showing that there is a genuine issue for trial." *Id.* at 324. The non-

9

moving party must produce "specific facts" showing a genuine issue for trial, not mere general allegations. *Tubacex v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

In deciding whether to grant summary judgment, the Court should view the evidence in the light most favorable to the party opposing summary judgment and indulge all reasonable inferences in favor of that party. The Fifth Circuit has concluded "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To the extent facts are undisputed, the Court may resolve the case as a matter of law. *Blackwell v. Barton*, 34 F.3d 298, 301 (5th Cir. 1994).

B.   Qualified Immunity

A government official performing a discretionary function is entitled to qualified immunity unless his actions violate a clearly established right of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Where, as here, a defendant invokes qualified immunity in a motion for summary judgment, it is the plaintiff's burden to show that the defendant is not entitled to qualified immunity. *See Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). That is, the plaintiff must present evidence sufficient to create a genuine dispute of material fact as to whether (1) the official's conduct violated a constitutional right of the plaintiff, and (2) the constitutional right was clearly established so that a reasonable official in the defendant's situation would have understood that his conduct violated that right. *See id.*; *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

1.      Constitutional Violation

Prison officials have a duty under the Eighth Amendment to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citations omitted). In order to establish a failure to protect claim pursuant to 42 U.S.C. § 1983, a plaintiff must demonstrate that (1) she was held in custody under conditions that posed a substantial risk of serious harm, and (2) that a prison official acted with deliberate indifference to the risk of harm. *Id.* at 834; *Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995). "Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). To establish deliberate indifference in the context of the Eighth Amendment, Plaintiff must show that Defendants (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed. *Farmer*, 511 U.S. at 837; *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998). The failure to alleviate a significant risk that [the official] should have perceived, but did not is insufficient to show deliberate indifference. *Domino*, 239 F.3d at 756 (citing *Farmer*, 511 U.S. at 838).

Plaintiff asserts that Defendants were deliberately indifferent to her safety when they transferred her from safekeeping to general population. There is undisputed evidence that Defendants Nelson, Franks, and Ray were aware of threats to Plaintiff *while in safekeeping* from July 2015 until November 2015. Because of threats from inmate Trump, Plaintiff had filed a life endangerment form and Defendant Nelson had separated the safekeeping inmates into two separate groups for safety purposes. *Id.* After the groups were separated, Plaintiff received another threat from Trump. Nine

days after the safekeeping inmates had been separated, the process to remove Plaintiff from safekeeping began. Pl. Am. Compl. (#40-1) at 14.

On November 18, 2015, Plaintiff attended a State Classification hearing with Defendants Ray and Franks. *Id.* at 15. There, Defendant Ray determined that Plaintiff would be transferred from safekeeping to general population. *Id.* Plaintiff asserts that she expressed her desire to remain in safekeeping and that she feared for her safety in general population based on her history of abuse there fourteen years before. *Id.* Defendant Ray asked Plaintiff if she got along with any other inmates in safekeeping, and Plaintiff responded that she only got along with inmate Saldivar. *Id.* Plaintiff mentioned to Defendant Ray that there was a recommendation in Plaintiff's file that she remain in safekeeping until media attention died down. *Id.* Plaintiff admitted that she could not name any person in general population that had made threats against her. *Id.*

Thus, the evidence shows that Defendants Nelson, Franks, and Ray knew that Plaintiff had suffered threats *while in safekeeping* over the previous five months. Further, Defendants knew that Plaintiff had suffered threats in general population more than fourteen years before and that this had prompted former Director Cockrell to recommend that Plaintiff remain in safekeeping until media attention in Plaintiff's case died down. Defendants knew that Plaintiff only got along with one other inmate in safekeeping. Further, Defendants knew that Plaintiff was not aware of any current threats in general population.

Deliberate indifference requires more than evidence of a desire to be returned to safekeeping. Plaintiff has presented no evidence that there was a substantial risk of harm, much less that Defendants were deliberately indifferent to any substantial risk. *See e.g. Neals*, 59 F.3d at 533 (no deliberate indifference where an inmate was assaulted, requested transfer to safekeeping that was

rejected, and filed 33 grievances indicating fear of harm); *Parker v. Currie*, 359 Fed.Appx. 488 (5th Cir., Jan. 4, 2010) (no deliberate indifference where multiple life endangerment investigations were done, each was investigated and found to be unsubstantiated, inmate transferred to different units, but he objected to any assignment to a general population unit).

In Plaintiff's case, after Plaintiff was threatened in safekeeping, Defendants separated the safekeeping inmates. Plaintiff was then threatened again and Defendants sought to transfer her away from the threatening inmate. Also, Plaintiff implies that assignment to any general population unit would put her at risk and she should be transferred to safekeeping.

Plaintiff alleges that her transfer was malicious because Defendants Nelson and Franks blamed Plaintiff for the conflicts that had arisen in safekeeping. Resp. Br. (#45) at 30. Plaintiff fails to provide any evidence of this malice aside from showing that, following a verbal altercation between herself and inmate Trump, Defendants Nelson and Franks sought to downgrade Plaintiff's custody level from P6 to P7. Resp. Br. (#45), Ex. K at 74. Plaintiff asserts this action was improper and indicates it is evidence that Defendants were trying to punish her. This request was denied by the Unit Classification Review.

Even assuming Defendants sought to remove Plaintiff from safekeeping as punishment for her actions in safekeeping, that only rises to the level of a constitutional violation if Defendants knew that transferring Plaintiff would expose her to serious risk in general population. *See Neals*, 59 F.3d at 533 (no constitutional right to be housed in a particular facility). In fact, the evidence indicates the opposite. At the time of Plaintiff's transfer, there were no known risks to Plaintiff's safety in general population. However, Plaintiff had recently filed a life endangerment form while in safekeeping.

Plaintiff seeks to bolster her claims that the high-profile nature of her case should have been obvious to all Defendants by referencing the alleged attacks she has faced since her transfer. While the Court need not determine whether the attacks actually occurred, it is sufficient to note that there is no corroborating evidence of at least two of these attacks. Therefore, it seems plausible there is not any heightened risk to Plaintiff whatsoever due to her high-profile case. Even in Plaintiff's own accounting of the alleged attacks, she does not indicate any reference to her high-profile case as a motive in at least two of the attacks. While none of this would excuse any unconstitutional actions, it is additional evidence that Defendants were not aware of and ignoring a substantial risk. If Plaintiff is fabricating these alleged attacks, as seems probable, there may be no risk at all.

As for Plaintiff's assertion that she is currently at substantial risk because her case is high profile and there are books available at the prison library that discuss her case, it is unclear that this poses a substantial risk to Plaintiff. There is certainly not any evidence in the record that having a high-profile case entitles a prisoner to transfer to safekeeping. Plaintiff relies on the evidence of her alleged assaults to show that her high-profile case puts her at risk, but as explained, that evidence is far from reliable.

Therefore, there is no constitutional violation regarding the decision to transfer Plaintiff from safekeeping to general population and Defendants are entitled to qualified immunity. There is no evidence tending to show that Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, or that any Defendant in fact drew the inference.

2. <u>Objective Reasonableness</u>

Because Plaintiff has failed to state a constitutional violation, the Court need not examine whether defendants' actions were reasonable. *See Saucier*, 533 U.S. at 201 (if the facts alleged do

not establish that the officer's conduct violated a constitutional right, then the qualified immunity analysis need proceed no further and qualified immunity is appropriate).

    C.    <u>Supervisory Liability</u>

Plaintiff has also failed to allege personal involvement on the part of Defendants Livingston and Stephens. Plaintiff has not alleged any facts to show that Defendants Livingston and Stephens were personally involved in any decision relating to Plaintiffs transfer from safekeeping. Plaintiff asserts that Defendants Livingston and Stephens had personal knowledge of the alleged constitutional violation due to a letter Plaintiff sent to Livingston, and assorted phone calls and letters sent to Defendants Livingston and Stephens by family and friends of Plaintiff. Correspondence to TDCJ officials is not sufficient to show personal knowledge. *See e.g. Smith v. Bell*, 2011 U.S. Dist. LEXIS 20452, *22-23 (E.D. Tex. Jan. 25, 2011) ("[T]he mere fact that correspondence was sent to the Director of TDCJ does not give liability based on purported personal knowledge of the matters contained within that correspondence."). Thus, Plaintiff has failed to allege any personal involvement of Defendants Livingston and Stephens.

To the extent Plaintiff is suing Defendants Livingston and Stephens for their supervisory roles, supervisory officials cannot be held vicariously liable in § 1983 cases solely on the basis of their employer-employee relationship. *Monell v. Department of Social Services*, 436 U.S. 658, 693 (1978); *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983). If a supervisor is not personally involved in the alleged constitutional deprivation, he may be held liable only if there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violations. *Thompkins v. Belt*, 828 F.2d 298, 303-04 (5th Cir. 1987). In order to demonstrate a causal connection, the supervisor would have to "implement a policy so deficient that the policy itself is a repudiation of

constitutional rights and is the moving force of the constitutional violation." *Id.* at 304. Here, the Court has determined there was no constitutional violation, thus Plaintiff cannot point any policy repudiating her constitutional rights, and there cannot be supervisory liability.

    D.    <u>Eleventh Amendment Immunity</u>

As Plaintiff recognizes, being sued in their official capacities for monetary damages, Defendants are immune from suit under the Eleventh Amendment because such an action is the same as a suit against the sovereign. *Pennhurst State School Hosp. v. Halderman*, 465 U.S. 89, 104 S. Ct. 900 (1984). The Eleventh Amendment generally divests federal courts of jurisdiction to entertain suits directed against states. *Port Auth. Trans-Hudson v. Feeney*, 495 U.S. 299, 304 (1990). The Eleventh Amendment may not be evaded by suing state agencies or state employees in their official capacity because such an indirect pleading remains in essence a claim upon the state treasury. *Green v. State Bar of Texas*, 27 F.3d 1083,1087 (1994).

However, the Eleventh Amendment does not apply to a request for a federal court to grant prospective injunctive relief against state officials on the basis of federal claims; thus, a request for prospective injunctive relief against state officials or employees in their official capacities falls within an exception to Eleventh Amendment immunity. *See Ex parte Young*, 209 U.S. 123, 149 (1908).

    E.    <u>Injunctive Relief</u>

Plaintiff's request for injunctive relief must also be viewed in conjunction with the requirements of the Prison Litigation Reform Act (PLRA). Under the PLRA, the Court must find that the prospective relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal

right," before granting injunctive relief. 18 U.S.C. § 3626(a). Here, as the Court has found no constitutional violation, there is nothing to remedy by injunction.

## CONCLUSION

It is therefore **ORDERED** that Defendants Motion for Summary Judgment (#41) is **GRANTED.**

**SIGNED** on January 18, 2017.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE