UNITED STATES DISTRICT COURT

WESTERN DISTRICT

WACO DIVISION

| | | |
|---|---|---|
| DIANE MICHELLE ZAMORA, TDCJ-ID #814993, | § § § | CIVIL RIGHTS COMPLAINT [§1983] |
| Plaintiff, | § § | |
| v. | § § | Case No. 6:15-CV-365-RP |
| WILLIAM STEPHENS, TDCJ-ID Director; | § § | Trial By Jury Demanded |
| MELODYE NELSON, TDCJ-ID Warden; WHITNEY FRANKS, TDCJ-ID Warden; DEBBIE RAY, BOC Representative; BRAD LIVINGSTON, TDCJ-ID Director; sued in their individual and official capacities. | § § § § § § § § | |
| Defendants. | § § | |

MEMORANDUM FOR PLAINTIFF'S §1983 CIVIL RIGHTS COMPLAINT
AMENDED AND SUPPLEMENTED

## I. JURISDICTION AND VENUE

**1.** This civil action is authorized by 42 U.S.C. Section 1983 to redress the deprivation under color of state law, of rights secured by the Constitution of the United States. The Court has jurisdiction under 28 U.S.C. Section 1331 and 1343(a)(3). Plaintiff seeks declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202. Plaintiff's claim for injunctive relief is authorized by 28 U.S.C. Section 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure. Plaintiff also seeks compensatory and punitive damages pursuant to 42 U.S.C. Section 1997e(e) for her physical injuries as well as pain and emotional/mental suffering.

**2.** Western District is an appropriate venue under 28 U.S.C. Section 1391(b)(2) because it is where the events giving rise to this conduct occurred.

## II. PLAINTIFF

**3.** Plaintiff, Diane Michelle Zamora, TDCJ-ID #814993 is and was at the times

mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice (TDCJ). She was confined at the Mountain View Unit in Coryell County, Gatesville, Texas before being transferred to her current location at the Hobby Unit in Falls County, Marlin, Texas.

III. DEFENDANTS

4. Defendant, William Stephens, is the Director for the Correctional Institutions Division of the Texas Department of Criminal Justice and is legally responsible for the overall operation of the Department and each institution under its jurisdiction, including the Mountain View and Hobby Units. He is hereby sued in his individual as well as official capacity, jointly and severally, for those acts and omissions described fully below.

Acting under color of state law as a Director of TDCJ and legally liable for all actions and inactions in his division as well as prisoners' protection in his custody, Defendant Stephens did fail to protect Plaintiff by approving her release from protective custody (P.C.)/safekeeping to general population, creating an opportunity for harm that did not otherwise exist. By depriving the Plaintiff of protective status, Defendant Stephens deprived her of the basic human need to be safe from harm and is responsible for both the physical harm she endured as well as the emotional/psychological suffering she continues to endure, a violation of her Eighth Amendment Constitutional Right against cruel and unusual punishment.

The harm ultimately caused was forseeable. Documented in her prison file are previous attacks and threats against Plaintiff, a direct consequence of both the national and international media attention her case received and continues to receive. The movie and books written on Plaintiff's case and widely circulated within the prison system posed an obvious risk (see Exhibit A). Plaintiff wrote Deputy Executive Director Janie Cockrell on June 14, 2002 and received a response on June 20, 2002 (see Exhibit B). Evidence

of these attacks and reported threats prompted Director Cockrell to call former Crain Unit Warden Ament to recommend Plaintiff's placement in protective custody. Warden Ament transferred Plaintiff to Mountain View Unit where former Head Warden Lynn Smith informed Plaintiff that an official letter documenting Director Cockrell's recommendation had been placed in her file. Defendant Stephens acted in willful disregard for the safety of the Plaintiff in light of this recommendation. Plaintiff's high profile status is OBVIOUS and poses a KNOWN risk that is documented in her initial hearing record for placement in protective custody on June 26, 2002. The record states that because of her high profile case, "her presence in population would pose a threat to her safety" (see Exhibit C). In the 4 months Defendant Stephens had to deliberate his decision, he had access to these documents for review. He ALSO had the documents of 2 other P.C. inmates who **requested** release from P.C. and were recommended for release by the names of Kimberly Trenor, TDCJ-ID #1549893, and Jessica Tata, TDCJ-ID #1831615. Defendant Stephens denied their release based on their cases being "high profile" despite the fact that neither Tata nor Trenor have movies or books written on their cases. Neither inmate can even remotely claim the worldwide attention given to Plaintiff's case and both REQUESTED release but were denied by Defendant Stephens. Yet, Defendant Stephens approved the release of Plaintiff AGAINST HER WILL, a **decision** that is illogical, reckless and incompetent given his decision to leave Tata and Trenor in P.C. Defendant Stephens acted with deliberate indifference to the substantial risk of serious harm under which he incarcerated the Plaintiff and in awareness of the recklessness of his decision. Plaintiff's life was placed in danger and at a significant risk of serious, immediate and proximate harm in the future when Defendant Stephens used his authority to approve the Plaintiff's release from a safe environment into a harmful one, conduct which defies reason, shocks the

conscience and leaves him fully liable for her physical and emotional suffering as well as any future harm.

5. Defendant, Melodye Nelson, is the Warden of the Mountain View Unit and employed by the Texas Department of Criminal Justice. She is legally responsible for the overall operation of the Department institution under its jurisdiction. She is hereby sued in her individual as well as official capacity, jointly and severally, for those acts and omissions described below.

Warden Melodye Nelson acted under color of state law when she willfully disregarded Plaintiff's safety by approving her release from protection into general population. Defendant Nelson is well aware of recent threats made against Plaintiff and another high profile inmate in her custody, Yolanda Saldivar. Plaintiff and Saldivar filed life endangerment forms and Defendant Nelson witnessed increasing hostility towards her 2 highest profile inmates, forcing her to take action to separate Plaintiff and Saldivar from the rest of the protective safekeeping inmates.

Defendant Nelson transferred all "protective custody" inmates to "protective safekeeping" status on June 27, 2015 and strongly desired for her new program to prove a success. Problems quickly arose as the other 4 prisoners chose to gang up on Plaintiff and Saldivar. Plaintiff's notoriety as "The Texas Cadet Murder" and Saldivar's notoriety as "The Selena Murder" cases should have made Warden Nelson particularly cautious to protect. Instead, Defendant Nelson chose to blame her 2 highest profile inmates for the new safekeeping program not working out as she desired and ignored her affirmative duty to protect all prisoners in her custody equally. Defendant Nelson was so AWARE of the risk of serious harm that she issued an IOC (Internal Office Communication) for all her officers to also be aware that there could be NO CONTACT WHATSOEVER between the high profile group (Plaintiff and Saldivar) and the other 4 prisoners. Defendant Nelson posted this notice in the P.C.

4

dorm and in the Officers' Post Orders binder. In deliberate indifference to Plaintiff's safety, Defendant Nelson pushed and approved Plaintiff's removal from P.C. With the knowledge that she placed Plaintiff at significant risk of future harm, Defendant Nelson recklessly disregarded the threat. It defies logic that if Plaintiff is not safe among the majority of the P.C. prisoners, she will be safer among the hundreds in general population. Defendant Nelson created an opportunity for forseeable harm to occur and deprived Plaintiff of the basic human right to be safe, cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution. Defendant Nelson is liable for the vicious attacks and threats Plaintiff has suffered since her arrival at the Hobby Unit, a direct consequence of her release from P.C. and her high profile status. In light of the life endangerment investigations that forced Defendant Nelson to take measures to prevent altercations against Plaintiff and Saldivar, choosing to approve Plaintiff for release to general population is particularly malicious, reckless and incompetent, leaving Defendant Nelson liable for any future harm that occurs.

6. Defendant, Whitney Franks, is the Asst. Warden of the Mountain View Unit and employed by the Texas Department of Criminal Justice. She is legally responsible for the overall operation of the Department institution under its jurisdiction. She is hereby sued in her individual as well as official capacity, jointly and severally, for those acts and omissions described below.

Acting under color of state law as the Asst. Warden at the Mountain View Unit of the Texas Department of Criminal Justice, Defendant Franks did willfully disregard Plaintiff's safety by recommending her release from P.C. to general population and influencing Defendant Ray, representative for the Bureau of State Classification, to also recommend Plaintiff's release from P.C. Defendant Franks did deprive Plaintiff of the basic human need

to be safe from bodily harm and violated her Eighth Amendment Right against cruel and unusual punishment in the U.S. Constitution.

When Plaintiff went before the State Classification Committee on November 18, 2015 and requested to remain in P.C., Defendant Franks rolled her eyes and smirked. Defendant Franks acted in conjunction with Defendant Nelson ONLY 8 DAYS PRIOR (on November 9, 2015) to separate Plaintiff and Saldivar from the other P.C. prisoners after both Plaintiff and Saldivar filed life endangerment forms. Defendant Franks ignored this very OBVIOUS risk and her affirmative duty to protect Plaintiff from harm. Dep't of Soc. Servs., DeShaney v. Winnebago County Dept. of Social Services 489 U.S. 189, 201 (1989) ("State has an affirmative 'duty to protect' a person whom the state has incarcerated or involuntarily institutionalized.") The attacks that ultimately occurred upon Plaintiff's arrival at the Hobby Unit were both forseeable, in light of past attacks, and AVOIDABLE. It should have been fairly direct and easy to deduce that Plaintiff would be at significant risk of serious harm in a group of hundreds of prisoners if enough risk existed in a tiny group to warrant a separation from other prisoners in acknowledgment of that danger. Defendant Franks's deliberate indifference to the obvious risks to Plaintiff's safety is shocking and that she went so far as to laugh at Plaintiff and nudge Defendant Ray when Plaintiff requested to remain in P.C. is malicious. Defendant Franks's decision was reckless and incompetent and makes her liable for the physical and psychological harm that Plaintiff has suffered since her release from P.C. as well as any future harm to occur.

7. Defendant, Debbie Ray is a representative for the Bureau of Classification of the Texas Department of Criminal Justice. She is legally responsible for the overall operation of the Department and each institution under its jurisdiction including the Mountain View and Hobby Units. She is hereby sued in her individual as well as official capacity, jointly and severally,

for those acts and omissions described below.

Defendant Ray acted under color of state law in violating Plaintiff's Constitutional Right against cruel and unusual punishment by deliberately disregarding the serious risk in releasing Plaintiff from P.C. into general population. Further, Defendant Ray released Plaintiff with a transfer to the Hobby Unit, reputed to be the most violent female penitentiary. Defendant Ray was aware of the significant risk this posed to Plaintiff's safety as it was evident in the file before her on November 18, 2015. Plaintiff's file contained past life endangerment forms from her previous time in general population as well as a recommendation by Defendant Ray's superior, Director Cockrell, that Plaintiff remain in P.C. until media attention was lessened. Plaintiff's file also contains the Administrative Segregation hearing record for initial placement in P.C. dated June 26, 2002 that states that, "her presence in population would pose a threat to her safety." Yet, Defendant Ray disregarded this OBVIOUS risk to Plaintiff's safety as well as Director Cockrell's recommendation and instead allowed herself to be influenced by Defendant Franks and her desire to be rid of Plaintiff.

Plaintiff informed Defendant Ray that she did not get along with the other P.C. inmates except for the one other very high profile inmate, Yolanda Saldivar. Plaintiff explained that recent threats had prompted her and Saldivar to file life endangerment forms and that Defendant Nelson was compelled to separate them from the others for safety purposes. Defendant Ray disregarded recent events and insisted that Plaintiff did not require protection because she had not received any threats from outside prison walls or other inmates in general population. Plaintiff stated that she had not lived outside prison walls OR in general population recently to hear and report any threats. In fact, all P.C. inmates are completely insulated within their own building and do not even go to medical or visitation with other prisoners. The streets

are completely cleared in order to move a P.C. inmate from one place to another. There is no opportunity to attacked or threatened because P.C. is PROTECTED. The Plaintiff let Defendant Ray know that she had recently been threatened by Offender Trump (TDCJ-ID #1305698), another P.C. inmate who is a known associate of the Aryan Brotherhood, and Defendant Ray documented this in the hearing record (see Exhibit D) but disregarded it. She said that Trump's threats did not count. Rather than listen, Defendant Ray accused Plaintiff of trying to manipulate her decision and documented this in the record as well, bringing a chuckle of agreement from Defendant Franks. Defendant Ray asked the Plaintiff to specifically name only inmates in general population who might desire to attack her. Plaintiff repeated that she had not lived in general population in years and could only name those who HAD assaulted her in the past, such as Oralia Casarez and LaTrina Nealy, not predict who in population might decide to harass her simply because they had seen the movie, read one of the books or had seen her face on the cover of a magazine, such as "People" (see Exhibit E for magazines). Plaintiff made it very clear that she did not desire to leave P.C. and that she fears for her safety in general population. Defendant Ray documented this desire in the record but chose to be deliberately indifferent to Plaintiff's safety and close her eyes to the forseeable harm. Defendant Ray allowed herself to be influenced by prejudice, that of Defendant Franks's as well as the media's depiction of Plaintiff's character as "manipulative". Having never met Plaintiff, Defendant Ray treated her as if she had serious hatred for her and no regard for her safety. Later, when responding to a letter from Pastor Duane Hoxworth, who wrote concerned for Plaintiff's safety, Defendant Ray LIED AND CONTRADICTED all she wrote in the State Classification Committee hearing record (see Exhibit F for Pastor Hoxworth's letters, Exhibit G for responses and compare with Exhibit D). Had Defendant Ray truly attempted to "ascertain" problems Plaintiff was having and seriously considered "any

direct or indirect threat by persons inside TDCJ or outside TDCJ" then Plaintiff would never have been removed from P.C. and sent (by Defendant Ray's choice of unit) to the most violent female prison in TDCJ. Defendant Ray failed in her affirmative duty to protect Plaintiff by using her authority to create an opportunity for harm that did not otherwise exist, acting recklessly, with incompetence and in conscious disregard of the risk her decision entailed. Defendant Ray is liable for the physical and emotional pain and suffering that Plaintiff has endured as well as any harm to come in the future.

8. Defendant, Brad Livingston, is the Executive Director of the Texas Department of Criminal Justice and is legally responsible for the overall operation of the Department and each institution under its jurisdiction, including the Mountain View and Hobby Units. He is hereby sued in his individual as well as official capacity, jointly and severally, for those acts and omissions described fully below.

Acting under color of state law, Defendant Livingston did give final approval for Plaintiff's release from P.C. into general population, deliberately disregarding the risks of serious injury to Plaintiff and failing in his affirmative duty to protect her from harm. Because a recommendation from former Deputy Executive Director Janie Cockrell was placed in Plaintiff's file, ONLY Defendant Livingston can overrule it. Defendant Livingston retains ultimate custody of Plaintiff and used his authority to approve her release from P.C., creating an opportunity for harm that did not otherwise exist. Defendant Livingston exhibits a deliberate indifference to Plaintiff's safety in that he disregarded the danger of his decision and also failed to respond to a single call or letter from Plaintiff and Plaintiff's family in the 4 months he had to deliberate his decision. During this time, he also had the opportunity to release the other 2 P.C. inmates who were REQUESTING release from protection and were recommended for release by Defendant Ray: Jessica

Tata (TDCJ-ID #1831615) and Kimberly Trenor (TDCJ-ID #1549893). Both are housed in P.C. for being "high profile" and he chose to leave these inmates in P.C. There can be no argument that Defendant Livingston KNEW of the serious risk such a move posed to Plaintiff's safety when the file set before him for approval revealed a significant history of problems in general population because of Plaintiff's high profile case. It also defies reason that he would FORCE Plaintiff to population against her will yet leave 2 other inmates in P.C. for being "high profile" who are requesting release and do not even remotely have the level of media attention as Plaintiff. Neither Offender Tata nor Offender Trenor have movies or books written on their cases. They also do not have the Plaintiff's long history of attacks and threats to her person. From the day of her arrest, Plaintiff has required extra protection and arrived to TDCJ from Tarrant County Jail P.C. To deliberately ignore Plaintiff's history of required protection and place her in harm's way is a violation of her Eighth Amendment Right against cruel and unusual punishment. Defendant Livingston is responsible for all the actions and inactions of his subordinates, including the Office of State Classification, that deceived Plaintiff's friends and family into believing she would be left in P.C. Defendant Livingston's decision to approve Defendant Ray's recommendation was reckless, incompetent and leaves him liable for the physical, mental and emotional suffering that Plaintiff has endured since her release from P.C. as well as any future harm.

## GROUNDS FOR REVIEW

### PLAINTIFF'S CONSTITUTIONAL RIGHT AGAINST
### CRUEL AND UNUSUAL PUNISHMENT IS BEING VIOLATED
### BY PRISON OFFICIALS

### IV. FACTS OF THE CASE

The Plaintiff arrived into TDCJ custody on February 23, 1998 from Tarrant

County Jail P.C. From the day of her arrest, Plaintiff has required extra protection due to the high profile nature of her case which generated many publications of literary writings, documentaries and a movie production (see Exhibits A and E) that have been shown and distributed throughout the prison system. This led to threats and opposition from many general population inmates causing the Plaintiff to have to defend herself on many occasions. Initially kept isolated during her first few days in TDCJ custody, Plaintiff was quickly released into population and began to experience problems with increasing severity. Plaintiff repeatedly requested placement in P.C. but was always denied protection.

The first assault occurred in the summer of 2000 when Plaintiff's cellmate, LaTrina Nealy, attacked her on the Riverside Unit. Though the Plaintiff had never met Nealy, Nealy had heard much about Plaintiff and did not wish to live with her. Nealy threatened to slice up the Plaintiff's face if Plaintiff did not refuse housing. Instead, the Plaintiff reported the threats to ranking officers but could get no help. During the 3 days that Plaintiff lived with Nealy, she did not sleep for fear of being attacked. Not wanting to be given a disciplinary case, Plaintiff would not refuse housing. During those 3 days, Nealy kicked the lockbox lid into Plaintiff's arm, hit Plaintiff in the face and flushed her lockbox keys down the toilet. After requesting medical attention and reporting the matter to rank, Plaintiff was told that because no officer witnessed the attacks, nothing could be done because it could just as easily be self-inflicted. Without an officer witness, the attacks essentially never happened, an attitude that continues to prevail today within the prison system. Plaintiff continued to desperately seek help and finally found that help in Lt. Dayton. After explaining the situation and showing Lt. Dayton the scrape and bruises she had, Plaintiff also began describing Nealy's enormous size (at approx. 5'10" and 368 lbs). Plaintiff told Lt. Dayton that she was

in fear for her life and Lt. Dayton replied, "If she is as big as you say she is, then you shouldn't be housed in the same cell anyway and I will move you." Lt. Dayton walked to the cell door to view Nealy, came back and told Plaintiff to pack her bags to be moved. Lt. Dayton also wrote a recommendation in Plaintiff's file (in early 2002) that she should be single-celled in the future for her own safety. He was conducting an investigation into threats to Plaintiff's safety at the time.

In September of 2000, Plaintiff was housed with prisoner Oralia Casarez as a cellmate and encountered similar problems as she experienced with Nealy. On September 25, 2000, Plaintiff stopped the shift Sgt. to report that Casarez was threatening her with bodily harm. This went ignored and shortly afterwards, Casarez attacked. Plaintiff was writing a letter when Casarez attempted to bash Plaintiff's head into the wall. Plaintiff screamed for help but neither her neighbors nor the officers answered. All the inmates and officers were silent, listening to the attack take place. Casarez threw Plaintiff against the wall, leaving huge bruises along her hip and thigh (photos exist in Plaintiff's file). When no immediate help arrived, Plaintiff attempted to defend herself by stabbing Casarez in the neck with her pen but Casarez quickly knocked the pen from Plaintiff's hand. Officers finally arrived to find Plaintiff on the ground with Casarez standing over her. TDCJ policy does not allow for inmates to defend themselves no matter the severity of the attack. Fighting in self-defense warrants equal punishment as the attacker. Plaintiff's mother called the media for help when former Warden Moten was not receptive. It infuriated Warden Moten that news reporters flooded her phone with questions about the attack and she housed Plaintiff in punitive Administrative Segregation in retaliation. The Plaintiff did not fight this decision because it would mean that she would be in a cell alone and safe from harm. Warden Moten was later arrested in an unrelated prison incident and replaced by Warden Ament.

Due for release from Ad. Seg., Plaintiff wrote a letter on June 14, 2002 to TDCJ-ID Director, Ms. Janie Cockrell detailing the threats made against her life. On June 20, 2002, the Plaintiff was sent a response from the Director's office (see Exhibit B) and on June 26, 2002, Plaintiff was moved from punitive Ad. Seg. at the Reception Unit to Protective Custody Ad. Seg. (now called Protective Safekeeping) at the Mountain View Unit. The reason given was that Plaintiff's "presence in population would pose a threat to her safety" (see Exhibit C). Plaintiff's criminal case was and continues to be "High Profile" and Director Cockrell, knowing this, recommended that the Plaintiff remain in P.C. until media attention had lessened. Media attention and interest remains high as the Plaintiff continues to receive media requests for interviews, most recently on June 30, 2016 from the producer for Mr. Piers Morgan (BBC reporter/Journalist in London) of "America's Got Talent" fame (see Exhibit H). Plaintiff has recently received requests for interviews from producer Elisabeth Davis of Indigo Films, Warner Brothers producer Jen Antonelli, producer Karen Schiffman, and Jessica Guerra for "People Magazine Investigates" (see Exhibits I-L). Plaintiff was diligent to periodically document the continued high media interest for the State Classification Committee (Exhibit M) in order to prevent release from P.C. Plaintiff is uniquely vulnerable in that the media covered her trial both nationally and internationally with gavel-to-gavel coverage. It was covered on Court TV as well as many shows including ABC's 20/20, Snapped, Dateline, Montel Williams, Geraldo Rivera and documentaries such as American Justice (at Exhibit E). Plaintiff was the subject of at least 3 books still available for purchase as well as the movie, "Love's Deadly Triangle: The Texas Cadet Murder" released by NBC and re-released by the Lifetime channel and re-titled as "Swearing Allegiance" (both at Exhibit A). It continues to air at a frequency of once every 3 months and has already been viewed throughout the prison system repeatedly and in the very dorms

Plaintiff has lived. State District Judge Joe Drago III presided over the case and admitted that the media coverage of Plaintiff's case took a personal toll saying, "It took me a long time to get over that trial- the stress and the media attention of everybody watching everything you did," (see Exhibit N). Vitriolic language spewed early on and continues. All one has to do is visit one of the many chat sites or You-Tube videos. Plaintiff's high profile status makes it impossible for her to simply blend in and live normally among the other inmates in general population.

On June 27, 2015, Defendant Nelson transferred all "Protective Custody" inmates to "Protective Safekeeping" and strongly desired for her new program to prove a success. Things quickly deteriorated as Offender Trump moved to control the group and used the other inmates to gang up on Plaintiff and Saldivar. The notoriety of Plaintiff as the "The Texas Cadet Murder" and Saldivar's notoriety as "The Selena Murder" cases should have made Defendant Nelson particularly cautious to protect. It was a reckless move to simply let all the P.C. inmates out of their cells to roam the dorm freely and not expect that there would be some problems. After enduring Trump's threats and an incident where Trump hurled a contraband, stainless steel weapon at Saldivar, Plaintiff and Saldivar filed life endangerment forms. On November 9, 2015, Defendant Nelson was compelled to separate all the P.C. inmates into 2 separate groups for safety purposes, groups which still exist to this day. She issued an IOC for all officers to be aware that there was to be no contact whatsoever between Saldivar and Plaintiff's group and the other 4 inmates. 9 days later, Defendant Nelson pushed to remove Plaintiff from P.C. in retaliation and full awareness that she placed her life in danger. Once she succeeded in removing Plaintiff from P.C., Defendant Nelson boasted cheerfully in front of Officer Turner, an unprofessional and malicious display of deliberate indifference for Plaintiff's safety (see Exhibit O

for Saldivar's letter in which Plaintiff is referred to as "Don", her childhood nickname, and Offender Trump is referred to as "Patrona", a Spanish word meaning "Boss").

On November 18, 2015, the Plaintiff attended a State Classification hearing with Defendants Ray and Franks present as well as Ms. Williams of Mountain View Unit Classification. It was determined that Plaintiff be recommended for release from P.C. When Plaintiff expressed her desire to remain in P.C., Defendant Franks rolled her eyes and smirked while giving Defendant Ray a nudge. When Defendant Ray asked if Plaintiff got along with the other inmates, Plaintiff responded that she only got along with Inmate Saldivar. Defendant Ray then asked Plaintiff if she had a statement and Plaintiff responded that she desired to remain in P.C. Defendant Ray answered that she was sending the Plaintiff to population. When Plaintiff mentioned the recommendation in her file from Director Cockrell, Defendant Ray replied that Director Cockrell had retired and that Plaintiff had not reported any threats to her safety recently. Defendant Ray said, "Give me some names of people in population or in the world who are threatening you." Plaintiff replied that she had not been in the world recently and was never around population inmates to hear any threats, that she could only name those who had assaulted her in the past such as Nealy and Casarez. Defendant Ray replied that these inmates were not even in the system anymore, something Plaintiff knew to be a lie. Nealy remains in the prison system and has a long history of assaultive behavior. Regardless, Plaintiff was not in P.C. because of any particular inmate but because her high profile case leaves her vulnerable to threats and attacks. Plaintiff mentioned that she had just filed a life endangerment form against Trump, an offender with ties to the Aryan Brotherhood. Defendant Ray was quick to reply, "Trump's threats don't count. How could she hurt you in population anyway?" Plaintiff replied, "She could send one

of her Aryan Brotherhood friends after me." Defendant Franks laughed and said, "You really should know about someone's associations before speaking on them." Plaintiff has known Trump since 2005 and knows that despite having turned State's evidence on some members of the Aryan Brotherhood, Trump has continued to remain in contact with many of her former gang through 3rd party mail. Many such letters were confiscated in 2005 by the previous Mountain View mailroom supervisor and even prompted visits by gang intelligence to see Trump, proving Plaintiff's concerns about Trump's associations have merit and that her threats to Plaintiff should be taken seriously. Defendant Ray refused to listen, accused Plaintiff of trying to manipulate her decision and treated her with hatred. Having never met Plaintiff, it was obvious that Defendant Ray had been prejudiced against her by Defendant Franks and Defendant Nelson's desire to remove Plaintiff from P.C. This callous disregard for Plaintiff's safety is also evident in Defendant Ray's malicious choice of Hobby Unit for Plaintiff's release, TDCJ's most violent and ill-reputed female unit, an extremely unreasonable choice for a P.C. inmate with a history of vulnerability to threats and attacks.

Plaintiff filed her grievance to protest this recommendation immediately and Plaintiff's loved ones attempted to contact Huntsville authorities in fear for her safety. TDCJ's State Classification representatives deceived Plaintiff's loved ones into believing she would not be released from P.C. Pastor Duane Hoxworth wrote and inquired and was assured Plaintiff remained under protection, only later receiving a response from Defendant Ray stating THE OPPOSITE (see Exhibits F & G). Defendant Nelson assured Plaintiff's aunt, Mary Mendoza, and mother, Gloria Rincon, that Plaintiff was not due for another review until May of 2016 when both Mendoza and Rincon inquired by phone. Ms. Rincon spoke with State Classification representatives in Huntsville by the names of "Brianna" and "Ms. Brown" who both assured her that Plaintiff

would  remain in P.C. Both Plaintiff and her loved ones were caught off gaurd when she was suddenly moved to population on February 18, 2016 (see Exhibit P).

Hobby Unit's violent reputation is a point of pride to the officers on the unit. When Plaintiff first arrived at the gate, she was met by Lt. Colbert who asked her, "Have you heard a lot of stories about Hobby Unit?" When Plaintiff nodded to affirm that she had heard many stories, Lt. Colbert replied, "They are all true. So, if you don't want to be one of those stories, you better learn to keep a low profile." This sentiment was later reiterated by Major Jameson. How does Plaintiff accomplish this when she is already high profile? Plaintiff was met with hostility and prisoners yelling obscenities at her (though no outright, specific threats at that time) on February 18, 2016 when she arrived. Plaintiff reported fear for her life and this hostility to a female from the Psychiatric Department who was conducting an intake interview on that date.

On February 19, 2016, a hispanic assailant attacked the Plaintiff and threatened future attacks. After lunch and at approximately 11:00 am, Plaintiff went to the pill line but was turned away by a male officer on duty so she cut into a line of people going back in the direction of her dorm. Not long after turning the street corner, a light-complected, hispanic girl attacked Plaintiff from behind. Having just arrived on the unit, Plaintiff did not even know this offender who began kicking at her legs as she walked saying, "I know who you are! You're that snitching cadet bit**!" Plaintiff felt something sting her neck several times that she believes to be a blade. Walking faster, Plaintiff feared to turn her head to look behind, terrified of being cut in the face. She perceived that her assailant was aiming for her jugular but only managed to cut the back of her neck. One particularly hard kick to her calf muscle caused Plaintiff to fall and her assailant to bark, "Get up you stupid bit**!" and kick her in the thighs. Getting

up quickly, Plaintiff took off toward her building and heard her assailant say, "Damn! That's the wrong side!" followed by, "It's alright! I'll see your bit** a** again soon!"

The following day, at visitation, the officer on duty reported Plaintiff's injuries to rank. Sgt. Busch arrived to take pictures before the visit and escorted Plaintiff to medical after the visit. Plaintiff's mother, Gloria Rincon, a registered nurse, inspected the injuries to her daughter's neck and body. Ms. Rincon spoke with Major Jameson about the assault, phoned Deputy Executive Director Bryan Collier's office and also spoke with Hobby Head Warden Wright. All were unhelpful. An Offender Protection Investigation (OPI) officially began on February 21, 2016 by Sgt. Busch and Lt. Tolvar. As soon as Lt. Tolvar read Plaintiff's statement, he called it "far-fetched" and accused Plaintiff of assaulting herself, never considering the absurdity of his accusation (see Exhibit Q). Lt. Tolvar also tried to accuse Plaintiff's cellmate, Gwendolyn Greene, prompting Greene to gather her friends to file statements in her defense and to disparage the Plaintiff. This is the sort of haphazard and careless investigation that led to many unfounded rumors about Plaintiff and a situation where inmates were writing the statements of other inmates (see Exhibits R-T). It prevented any meaningful investigation into the attack against Plaintiff. Lt. Tolvar never attempted to locate the assailant that Plaintiff described to him. He was more intent on defending the fact that none of his officers witnessed the incident. Plaintiff was told that if one of his officers did not witness it, it just did not happen.

On February 22, 2016, Major Jameson denied Plaintiff's plea for protection while claiming that she also witnessed no incident and none of her officers were "asleep at the wheel". Captain Bailey also sat on this committee and though she denied Plaintiff protection, she did admit that she believed Plaintiff's fear to be genuine.

On March 27, 2016, Plaintiff filed a grievance against first-shift gaurd Ms. Nelson for attempting to instigate hostility in the dorm against Plaintiff (see Exhibit U). Ms. Nelson has continually harassed Plaintiff and taken it upon herself to go to other prisoners in Plaintiff's dorm to inform them about the movie or details of the case, creating an unsafe environment for Plaintiff. This was also reported to Captain Bailey on March 31, 2016 and Plaintiff informed her that she fears to even go to recreation because it would make her too vulnerable for attack. None of Plaintiff's witnesses were interviewed as it is TDCJ policy not to believe inmates. If the officer denies the accusation, the case is closed (see Exhibit V). Grievances were returned denied.

Plaintiff has also recently (6/14/16) filed a grievance against officer Ms. Collins who repeatedly harasses Plaintiff about her case, calling her "The Cadet Killer" in front of inmates and staff. Because Officer Collins denies this, that has been sufficient for TDCJ to close the investigation.

On May 16, 2016, at approximately 4:00 am while returning to her dorm after breakfast, Plaintiff was assaulted by a hispanic offender by repeatedly being struck in the back with an unknown weapon. Plaintiff was left with welts all down her back and threatened with future sexual assault as the offender swore to shove the weapon in Plaintiff's vagina if afforded another opportunity. Plaintiff filed an OPI that was met with ridicule and laughter by the Hobby Unit administration. Photographs of Plaintiff's injuries were taken to be placed in her file. Plaintiff filed a grievance about the assault and requested protective custody. The grievance has somehow disappeared and protection was denied.

At a hearing for Temporary Restraining Order on June 6, 2016, Plaintiff was prevented from presenting any of her evidence before the Federal Court to plead her case because of TDCJ's failure to notify her of where she was

being taken. All notifications from the court arrived well after the hearing had taken place and can be verified by Hobby mailroom records. Plaintiff was not allowed to take ANYTHING with her to the hearing. This "dirty pool" is an abuse of power and retaliation on the part of TDCJ in order to stack the deck even further in its favor where it already has the advantage since Plaintiff is pro se. No attorney would ever be forced to take notes on his hand with a borrowed pen to plead his case as Plaintiff was forced to do under those unusual circumstances. The Plaintiff never stood a chance. Rather than admit it erred in releasing Plaintiff from protection and correcting the wrong, TDCJ prefers to paint P.C. as some sort of country club.

All improvements to the Protective Safekeeping setting are very recent whereas Plaintiff's requests for protection extend back to when TDCJ first placed her in the general prison population from Tarrant County Jail P.C. in 1998. This is long before improvements such as air conditioning (introduced in July 2009), televisions (July 2009), and a garden (August 2015) were introduced into the P.C. setting. To use such improvements against Plaintiff, who resided in P.C. YEARS BEFORE such improvements is even further deceit on the part of TDCJ. It is the equivalent to claiming someone got married for wealth when the marriage existed prior to any wealth. It also should be noted that Plaintiff has had to work a grand total of 7 days in the 6 months that she has resided on the Hobby Unit and is no longer required to work the Field Squad at all due to medical reasons that existed since 1995 and have been in her file since her arrival to TDCJ. Plaintiff worked far more in Protective Safekeeping! To use work as a motive to return to P.C. is more deceit on the part of TDCJ to ignore the crux of the matter.

Prejudice against Plaintiff has run rampant among the Hobby Unit staff. Warden Wright admitted at the TRO hearing that she has made NO ATTEMPT to locate Plaintiff's assailant because she does not believe the person to

exist, though unit investigations have never dismissed Plaintiff's claims as "unfounded" simply "unsubstantiated". Now this prejudice has grown to the point of not investigating Plaintiff's reported threats AT ALL. On June 20, 2016, Plaintiff reported a threat to Captain Sullivan by Offender Lizette Vasquez, TDCJ-ID #1741221, after Vasquez made threats to cut Plaintiff's face (see Exhibit W). No investigation had taken place until complaints by Plaintiff's mother forced an investigation on July 8, 2016, almost 3 weeks after the fact. Captain Sullivan claims that he never received Plaintiff's letter, nor a note from Veronica Muniz to Capt. Sullivan which Plaintiff witnessed being placed in the mail herself. That Capt. Sullivan never received not just Plaintiff's letter but that of Veronica Muniz is highly improbable. To simply ignore a reported threat is evidence of deliberate indifference in the extreme and makes TDCJ a party to that threat by omission. Muniz claims that she was intimidated by the Hobby Unit administration into denying her knowledge of the threat even though she had already signed a sworn declaration on the matter (see Exhibit X). She also claims further intimidation because Offender Vasquez was making threats to cut her face as well should she admit anything against Vasquez, who still lived in the dorm with Muniz and Plaintiff at the time of the investigation. Vasquez was moved shortly thereafter for assaulting an officer. Muniz also witnessed the intimidation of Inmate Jimenez who she saw on her knees begging Sgt. Benjamin after being called in to give a statement about the threat for which she also signed a sworn declaration (see Exhibit Y). This is the sort of corruption that governs the hobby Unit and it should come as no surprise that Warden Wright has previously been sued for failing to protect a vulnerable inmate (see Johnson v. Johnson, 385 F. 3d 503 (5th Circuit). In this instance she failed to protect an inmate on the Allred Unit when she was head of Unit Classification. Johnson's claims of assault were repeatedly deemed "unsubstantiated" and he was told by the

Defendants in that case that he should learn to "fu** or fight." This is similar to the treatment Plaintiff has received under her watch.

On June 15, 2016, Plaintiff learned that the book <u>True Crime Stories From the Files of People</u>: Cases That Shocked America (copyright 2012) was on the Hobby Unit library bookshelf. This book contains photos of Plaintiff, her co-defendant and the victim reprinted from previous articles in People Magazine. The book had already been vandalized with graffiti that gives the Plaintiff's housing location for anyone in the inmate population who might want to locate her. This is like placing a huge target on the Plaintiff's head and is not something any other inmate on the Hobby Unit (or any unit) has to endure. This book has been passed around in the very dorm where Plaintiff lives and poses a real threat to her safety. While TDCJ would like to pretend that Plaintiff's high profile case status is not an issue or that the passage of time has erased all danger, the fact that a book has so recently been released shows this to be untrue. The frequent rotation of this book on the unit has caused hostility towards Plaintiff and much psychological distress. Plaintiff has filed a grievance on the issue which was returned stating that the issue was "non-grievable" (see Exhibit Z). Plaintiff had also heard that the Ann Rule book on her case entitled <u>In the Name of Love</u> was also on the library bookshelf but Plaintiff wasn't able to locate it. Plaintiff's mother wrote Huntsville authorities to demand that all books concerning the Plaintiff be removed from the library bookshelf. There exists at least 4 books on Plaintiff's case (also <u>Blind Love</u> by Peter Meyer and <u>The Cadet Murder Case</u> by A.W. Gray). None should be available for other inmates to check out from the library.

Though Plaintiff is particularly vulnerable at a unit of violent repute such as Hobby Unit, she has resided on nearly every female prison unit at one time or another (including Terrace Unit, Riverside Unit, Reception Unit,

Sycamore Unit, Mountain View Unit and the Lane Murray Unit) and experienced harassment and threats wherever she goes. Plaintiff Zamora should not have to sit and wait for the next violent assault to occur before she is granted protection, especially when serious risk exists and harm is likely to occur in the future. Helling v. McKinney, 509 U.S. 25 (1993). Plaintiff has endured more than enough physical injury in the past and still bears the scars from these most recent encounters. Plaintiff was kicked with such force that her legs remain darkly discolored from the trauma. 6 months later, these bruises have yet to heal completely. Her back is similarly marked with scars that refuse to fade. The combined trauma of these recent assaults and threats has caused the Plaintiff severe depression, stress, fear and anxiety that has resulted in a weightloss of over 30 pounds to this date.

It must also be noted that on August 22, 2016 that Plaintiff reported to first shift officer Ms. Bailey that Plaintiff's current cellmate, Leslie Sykes, TDCJ-ID #2062096, hit, pushed her and flushed her underwear down the toilet. Absolutely nothing was done about the incident and Plaintiff continues to reside with this mentally unstable inmate. Because Plaintiff had no bruises to show Ms. Bailey, this incident wasn't a concern to her. Plaintiff has filed a grievance to document the assault.

The Plaintiff asserts that harm done to her in the past is very likely to happen to her again in the future if she is not returned to P.C. The threat of harm the Plaintiff faces is greater than the harm prison officials will face if the Plaintiff gets Preliminary and Permanent Injunction Relief. This will serve the public's interest. The Plaintiff contends that the defendants are in violation of her right to be safe from harm. It is without argument that prison officials in June of 2002 KNEW the Plaintiff's life was in danger in general population and determined that she needed protection. The Plaintiff maintains that she can and will suffer irreparable harm if she is not returned

to protective status and that she is in fear for her life and safety.

## V. ARGUMENTS AND AUTHORITIES

Prison officials violate the Eighth Amendment of the United States Constitution when they act with deliberate indifference to a prison condition that exposes a prisoner to an unreasonable risk of serious harm or deprives a prisoner of a basic human need such as "to be safe". The Eighth Amendment's prohibition of cruel and unusual punishment also protects the Plaintiff's right to safe and humane conditions in prison. The Plaintiff is challenging a prison condition she is being forced to endure as a result of her release from P.C. to general population that is seriously affecting her health and safety thereby meeting the "OBJECTIVE STANDARD" as required by the Eighth Amendment. FARMER V. BRENNAN, 511 U.S. 825 (1994); WILSON V. SEITER, 501 U.S. 294 (1991). The Plaintiff challenges that the condition of being released from Protective Custody/Safekeeping to general population puts her at serious risk for injury in the future. HELLING V. McKINNEY, 509 U.S. 25 (1993).

The defendants knew of the threats and past assaults to Plaintiff as well as her desire to be safe and remain under protection. Yet, the defendants acted with deliberate indifference by not responding in a REASONABLE manner. FARMER V. BRENNAN, 511 U.S. 825 (1994). The Plaintiff has been in protective status since June 2002 because her life was and continues to be in danger as a consequence of her high profile case. This condition was KNOWN and OBVIOUS to all defendants but they are purposely ignoring the danger Plaintiff faces by her release from P.C. Prison officials cannot ignore a problem once it is brought to their attention. VANCE V. PETERS, 97 F.3d 987 (7th Cir. 1996); ASHFORD V. U.S., 511 F.3d 501 (5th Cir. 2007). The Plaintiff's complete record including life endangerment forms filed by the Plaintiff, was set before Defendants Ray, Franks and Nelson before and during the State Classification meeting. It was set before Defendants Stephens and Livingston for approval

thereafter. To ignore the record is egregious and contemptible. The Plaintiff, therefore, has met the "SUBJECTIVE STANDARD" as required by the Eighth Amendment.

The Supreme Court in FARMER, supra, stated that to bring a failure-to-protect claim, the Plaintiff had to show "DELIBERATE INDIFFERENCE" by proving that (1) gaurds "KNEW" that there was a substantial risk the Plaintiff would be seriously harmed; and (2) they failed to respond REASONABLY to protect the Plaintiff. ESTELLE V. GAMBLE, 429 U.S. 97, 103-04 (1976). It is a violation of Plaintiff's Eighth Amendment Right against "CRUEL AND UNUSUAL PUNISHMENT" to refuse to place Plaintiff in protective status when prison officials know the Plaintiff can be seriously harmed in general population and do not take action to stop that harm. Prison officials acknowledged the harm that could come to Plaintiff as a result of her high profile case when she was placed in P.C. back in June 2002. To release her to population AGAINST HER WILL yet keep lower profile Offenders Tata and Trenor in P.C. for being "high profile" when they are requesting release is exremely UNREASONABLE judgment. These offenders are not even remotely as publicized as the Plaintiff and have zero history of threats or attacks. Yet, it was Plaintiff who was released in an act of extreme deliberate indifference and incompetence. "[If] an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had knowledge of the risk." FARMER V. BRENNAN, 114 S.Ct. 1970(1994), 511 U.S. 842 at 1981-1982. Prison officials not only have knowledge of the risk but continue to expose Plaintiff to that risk, jeopardizing her future health

and safety. HELLING V McKINNEY, 509 U.S. 25 (1993). Prisoners do not need to endure extreme treatment before filing an action with a court, nor, indeed, do they need to await a deprivation of life's necessities if it can be shown that serious risks exist and harm will likely occur in the future. "It would be odd to deny an injunction to inmates who plainly prove an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." Id. at 509 U.S. 25 (1993). Plaintiff should not have to defend herself or depend on the protection of other inmates (see again Exhibit Y) that the Texas Dept. of Criminal Justice has an affirmative duty to provide, ESPECIALLY when it creates the danger (McQUEEN V. BEECHER CMTY. SCHS., F.3d 460,464,469 (6th Cir. 2006). See also PENA V. DePRISCO, 432 F.3d 98,108 (2d Cir. 2005)(adopting state-created danger doctrine) by releasing Plaintiff from protection against her will and then leaving her in an unsafe environment under conditions where a state-provided book on her case is allowed to be circulated among the prison population for months. TDCJ has practiced deceit in various forms and cannot be trusted with Plaintiff's safety and security when it blatantly refuses to investigate a reported threat against Plaintiff because of gross prejudice. TDCJ already has a long history of ignoring attacks and threats to Plaintiff which is the very reason that former Director Cockrell stepped in to grant Plaintiff protection in 2002. It is WELL ESTABLISHED that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates.(see FARMER V. BRENNAN, 511 U.S. 825,832-33, 114 S.Ct. 1970, 1976-77, 128 L.Ed 2d 811 (1994). Plaintiff has repeatedly put prison officials on notice of the substantial risks to her safety from 1998 to the present day. The Defendants' conduct is objectively unreasonable in light of the clearly established law. CANTU V. JONES 293 F.3d 839 (5th Cir. 2002) and plainly incompetent. MALLEY V. BRIGGS, 475 U.S. at 335, 106 S.Ct. at 1093 (stating that the doctrine of qualified immunity

"provides ample protection to all but the plainly incompetent or those who knowingly violate the law.") Defendants have KNOWINGLY placed Plaintiff's life in danger with an act of sheer incompetence.

There is a specific TDCJ-ID policy/regulation that constrains prison officials judgment other than the prison's general duty to house offenders to a particular custody and their decision-making ability. TDCJ-ID safety policy ED-10.61 by the authority of Tex. Gov't Code §493.006(b), states that TDCJ-ID shall emphasize a safe environment for all employees and "OFFENDERS". TDCJ-ID is committed to "COMPLIANCE" with all applicable "SAFETY RULES" and regulations. Employees shall follow all "SAFETY" policies and procedures and report "UNSAFE CONDITIONS", "HAZARDS" or "ACTS" as described in AD-10.63 "OPERATIONAL RISK MANAGEMENT PROGRAM" and the TDCJ-ID "RISK MANAGEMENT MANUAL". The Plaintiff asserts that she has raised "SAFETY" and "HAZARDOUS" concerns against her life while in general population to different prison officials thereby triggering the policy that prompted Director Cockrell to take immediate action to place the Plaintiff in Protective Custody. The Plaintiff argues that the Defendants unreasonably disregarded excessive risk to the Plaintiff's safety by recommending and approving the Plaintiff for release from Protective Custody/Safekeeping back into the general population violating TDCJ-ID policy ED-10.61, Texas Statute Tex.Gov't Code §493.006(b) and AD-10.63. The Plaintiff contends that she can bring this kind of claim before she is injured again to ask that this decision by the Defendants not be allowed to stand but rather that the Plaintiff be returned to Protective Custody/Safekeeping. Prison officials have the culpable state of mind necessary for this type of punishment of placing the Plaintiff in general population where harm could come to her to be regarded as "CRUEL AND UNUSUAL". WILSON V. SEITER, 501 U.S. 294, 298, 115 L.Ed.2d 271, 111 S.Ct. 2321.

The Plaintiff can file for an injunction if she is experiencing any of

the following:

    (1) overcrowded, "UNSAFE", or extremely harsh conditions;

    (2) a pattern of gaurd brutality or harassment;

    (3) inadequate medical care; or

    (4) "CONTINUING VIOLATION OF ANY OF HER RIGHTS".

An injunction is an order issued by a court that tells the Defendant to do or not do some act or acts. It can require the Defendants to act in a way that will prevent them from violating Plaintiff's rights in the future. The Plaintiff seeks this emergency preliminary injunction relief because prison officials have already released her from Protective Custody/Safekeeping into the general prison population which places the Plaintiff's life in danger. JACKSON V. DISTRICT OF COLUMBIA, 254 F.3d 262 (D.C. Cir. 2001).

The Plaintiff asserts that if she is forced to wait until this case is resolved at trial, she will be irreparably harmed. Irreparable harm is an injury that would cause permanent injury or damage that cannot be fixed by money or some other form of relief. Due to Plaintiff's "HIGH PROFILE" criminal case, she has sustained physical assaults repeatedly in the past and had to defend herself which is the reason why former Director Janie Cockrell placed Plaintiff in Protective Custody. On-going threats, actual physical harm sustained in the past and emotional pain are examples of irreparable harm in violation of Plaintiff's Constitutional Rights. The Plaintiff will suffer "immediate and irreparable injury, loss or damage" if the Court doesn't help before TDCJ-ID Prison officials have a chance to respond or this case is resolved at trial.

In MILLER V. CARLSON, 768 F. Supp. 1331, 1340 (N.D. Cal 1991), the Plaintiffs were poor people who received AFDC (Aid for Families and Dependent Children) so the judge did not make them pay security. The Plaintiff asks this Court not to require security from the Plaintiff as she has no job, no income and

only receives gifts from family and friends.

## VI. EXHAUSTION OF LEGAL REMEDIES

Plaintiff, Diane Michelle Zamora, used the prisoner grievance procedure to try to solve the problem. Attached is a copy of her Step 2 response received on February 12, 2016 stating only that Plaintiff was at the time still assigned S3/P6 (Protective Status).

## VII. LEGAL CLAIMS

Plaintiff realleges and incorporates by reference I-VII.

Defendants Stephens, Nelson, Franks, Ray, and Livingston were DELIBERATELY Indifferent to the substantial risks and unsafe conditions when they recommended and approved Plaintiff, Diane Michelle Zamora, for release from protection against her will, violating her Eighth Amendment Right against cruel and unusual punishment in the U.S. Constitution.

The Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the Defendants unless this Court grants the declaratory, preliminary and permanent injunctive relief which Plaintiff is seeking. Plaintiff also seeks compensatory and punitive damages for the unnecessary pain and suffering she has endured as a consequence of the actions of the Defendants who violated her rights.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment granting Plaintiff:

A declaration that the acts and omissions described herein have violated Plaintiff's Constitutional Rights, and stating the Defendants' duties with respect to those Rights.

A preliminary and permanent injunction ordering Defendant Stephens, Nelson, Franks, Ray and Livingston to return Plaintiff to Protective Custody/

Safekeeping.

Compensatory and punitive damages for the unnecessary physical pain and emotional suffering Plaintiff has endured, in an amount as yet to be deduced from the evidence, but in no event in an amount less than $100,000.00.

Any other relief the Court may deem just and proper.

Trial by jury is hereby demanded on all claims alleged herein, and the parties are hereby given notice, pursuant to Fed. R. Civ. P. 38(a)-(c).

Dated: _August 29, 2016_

Respectfully Submitted,

Diane Michelle Zamora
Plaintiff, pro se, TDCJ-ID #814993
742 FM 712 Hobby Unit
Marlin, Texas 76661


VERIFICATION

I have read the foregoing complaint and hereby verify that the matters therein are true and correct to the best of my knowledge, under penalty of perjury and pursuant to 28 U.S.C. §1748.

Dated this 29th day of August, 2016.

Diane Michelle Zamora

CERTIFICATE OF SERVICE

I, Diane Michelle Zamora, do hereby certify that the foregoing Amended Complaint has been sent by certified mail to the United States District Court, Western District, Waco Division, 800 Franklin Ave., Room 380, Waco, Texas 76701 on this 29th day of August, 2016.

Diane Michelle Zamora

I, Diane Michelle Zamora, do hereby certify that the foregoing Amended Complaint has been sent by certified mail to the attorneys for William Stephens, Melodye Nelson, Whitney Franks, Debbie Ray and Brad Livingston at the Office of Attorney General Ken Paxton, Attn: Asst. Attorney General Briana Webb, PO BOX 12548, Capitol Station, Austin, Texas 78711 on this 29th day of August, 2016.

Diane Michelle Zamora

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT

WACO DIVISION

DIANE MICHELLE ZAMORA, TDCJ-ID #814993 §

    Plaintiff, §    ORDER TO SHOW CAUSE FOR A

v. §    PRELIMINARY INJUNCTION

WILLIAM STEPHENS, ET AL, §    6:15-CV-365-RP

    Defendants. §

     Upon the complaint, the supporting affidavits of Plaintiff, and the memorandum of law submitted herewith, it is:

    **ORDERED**, that defendants William Stephens-TDCJ-ID Director, Melodye Nelson-TDCJ-ID Warden, Whitney Franks-TDCJ-ID Asst. Warden, Debbie Ray-BOC Representative, and Brad Livingston-TDCJ-ID Director, show cause in room_____ of the United States Courthouse, on the _____day of _____, 2016, at_____ o'clock, why a preliminary injunction should not issue pursuant to Rule 65(a) of the F.R.C.P. enjoining the defendants, their successors in office, agents and employees and all other persons acting in concert and participation with them, returning the Plaintiff to Protective Custody/Safekeeping.

    **IT IS FURTHER ORDERED** that the order to show cause, and all other papers attached to this application, be served on the aforesaid Plaintiff by _____day of _____, 2016.

_____

UNITED STATES DISTRICT JUDGE

Dated:_____